# In the United States Court of Federal Claims

No. 11-558C
(Filed: June 9, 2016)

*********************************

PRECISION STANDARD, INC.,

                *Plaintiff*,

   v.

THE UNITED STATES,


                *Defendant*.

*********************************

Contract Disputes Act, 41 U.S.C. § 609(a) (2012); Defense Priorities and Allocations Systems; waiver of delivery dates; equitable adjustment; conditional approval

-------------------

## OPINION

-------------------

BRUGGINK, *Judge*.

      Plaintiff, Precision Standard, Inc. ("PSI"), brings this case pursuant to the Contract Disputes Act, 41 U.S.C. § 609(a) (2012) and the Tucker Act, 28 U.S.C. § 1491(a) (2012) against the United States seeking equitable adjustment and damages arising under various contracts between it and the Defense Logistics Agency ("DLA" or "the Agency"), formerly known as the Defense Supply Center Richmond ("DSCR"). Pending is defendant's motion for partial summary judgment on Counts 2 through 9 of the complaint.[1] The motion is fully briefed, and oral argument was held on April 6, 2016. For the reasons stated below, we grant in part and deny in part defendant's motion for summary judgment.

-----

[1] The complaint contains nine counts. Count 1, however, is not included in this motion.

BACKGROUND[2]

There are 28 contracts at issue in Counts 2 through 9 of the complaint. These contracts, each of which was for a particular aircraft part, were entered into between April 2006 and January 2009. The majority of the contracts required first article testing to be performed at Warner Robins Air Force Base ("Warner Robins"). The remainder required first article testing at Hill Air Force Base ("Hill"). They are listed as follows:

| Count | Contract No. | Contract Date | Part |
|---|---|---|---|
| 2 | SPM4A7-07-0105 | March 23, 2007 | Upper Thrust Reverser Fan Cowlers |
| 3 | SP0407-06-M-9684 | April 18, 2006 | Structural Aircraft Panels |
| 4 | SPM4A7-08-M-5689 | March 31, 2008 | Access Covers |
| 5 | SP0407-05-C-2028 | March 28, 2005 | Trailing Edge Panels |
| 6 | SPM4A7-09-D-5547 | July 2009 | Bundle Covers |
| 7 | SPM4A7-08-D-0316 | July 30, 2008 | Coupling Adapter Sleeves |
| 8(A) | SPM4A7-07-D-3180 | March 6, 2007 | Lower Left Panel Aircraft Assemblies |
| 8(B) | SPM4A5-08-M-2072 | February 22, 2008 | Access Covers |
| 8(C) | SPM4A7-07-M-6269 | April 12, 2007 | Fairing Assemblies |

---

[2] The facts are drawn from the appendices filed with the parties' briefing.

| 8(D) | SPM4A7-08-C-0387 | June 6, 2008 | Aircraft Fairings |
| 8(E) | SPM4A7-08-D-0274 | June 23, 2008 | Fuselage Fairing Panels |
| 8(F) | SPM4A7-07-M-A678 | August 6, 2007 | Aircraft Fairings |
| 8(G) | SPM4A7-07-M-C357 | September 14, 2007 | Aileron Trailing Edge Assemblies |
| 8(H) | SPM4A7-08-C-0481 | August 16, 2008 | Aircraft Access Doors |
| 9(A) | SPM4A7-08-M-2238 | November 29, 2007 | Trailing Edge Wing Assemblies |
| 9(B) | SPM4A7-08-M-4809 | January 17, 2008 | Insulation Panels |
| 9(C) | SPM4A7-08-M-6942 | February 25, 2008 | Lower Bunk Panels |
| 9(D) | SPM4A7-08-M-7318 | March 14, 2008 | Aircraft Floor Panels |
| 9(E) | SPM4A7-08-M-8566 | April 1, 2008 | Aircraft Fairings |
| 9(F) | SPM4A7-08-M-A725 | May 16, 2008 | Wheel Panel Assemblies |
| 9(G) | SPM4A7-08-M-A912 | May 31, 2008 | Aircraft Retainer Assemblies |
| 9(H) | SPM4A7-08-M-B771 | June 10, 2008 | Aircraft Floor Panels |
| 9(I) | SPM4A7-08-M-D715 | July 23, 2008 | Aircraft Panel Assembly |

| 9(J) | SPM4A7-08-M-F252 | August 25, 2008 | Helicopter Access Covers |
| 9(K) | SPM4A7-09-M-3933 | January 30, 2009 | Aircraft Access Doors |
| 9(L) | SPM4A7-07-M-0637 | October 26, 2006 | Cowlings |
| 9(M) | SPM4A7-08-M-7193 | March 5, 2008 | Panel Assemblies |
| 9(N) | SPM4A7-08-M-7646 | March 21, 2008 | Bulkhead Clips |

The parties set forth arguments which pertain to every contract, arguments which pertain to a specific group of contracts, and arguments that pertain to individual contracts. Before discussing these arguments, we will detail the facts that led to the dispute for each contract individually.

**Count 2**

DLA awarded contract number SPM4A7-07-0105 to PSI on March 23, 2007. The contract was for 33 upper thrust reverser fan cowling covers for a total price of $154, 300. The first article was due for testing 120 days later, on July 21, 2007. Defendant claims that the Agency received the first article in September 2007. After receiving and testing the first article, DLA rejected it on January 11, 2008. In its correspondence with PSI, the Agency stated that the first article did not conform to the procurement specifications and pointed out nine specific defects. The letter also stated that PSI had the opportunity to correct the nonconformance and resubmit two first articles for testing, at a cost to PSI of $5,880.20. PSI challenged the rejection on February 14, 2008, and requested conditional approval. In its May 7, 2008 response, DLA denied the request for conditional approval and informed PSI the first article was not manufactured in accordance with the drawings.

PSI submitted a second first article to Warner Robins for testing in September 2008. Contracting Officer ("CO") Carl Hudson sent PSI a letter on April 15, 2009 informing PSI that the second first article failed inspection. The letter identified 10 different defects, and offered PSI the option of submitting another first article for testing or cancelling the contract. According to the

4

letter, the third re-test would cost PSI $6,062.47. In August 2009, DLA returned the second first article to PSI. In November 2009, DLA send PSI an email requesting that PSI inform the Agency whether it would submit another first article and requesting a revised delivery schedule or cancellation request by December 3, 2009. PSI did not respond to this email.

On January 4, 2010, the contracting officer issued a unilateral modification P00002 cancelling the contract "at no cost or obligation to either party." Def.'s App. 19A. On April 30, 2010, PSI responded with an inventory schedule and advised DLA that it would be submitting a termination settlement proposal. *Id.* at 19C. DLA responded on May 4, 2010 with a show cause notice, which stated that modification P00002 should not have been issued as a unilateral no-cost modification and was therefore rescinded. However, the letter informed PSI that it was delinquent on the contract and that DLA was considering cancelling for default.

PSI responded to the show cause notice on May 11, 2010, asserting that the Agency illegally imposed a requirement that the parts conform exactly to the product-part specifications and arguing that the government had no valid basis for a termination for default. It also stated that, on June 1, 2007, PSI had written the government asking for assistance and cooperation in checking PSI's drill bit template, but that the government never responded.

PSI sent a supplemental letter on June 30, 2010, asserting that the part it sent as its second first article was actually the same part as the initial first article, with the identified defects corrected, yet Warner Robins had found completely new defects in the second first article. The letter went on to state that the fact that Warner Robins is a manufacturing competitor of PSI created a conflict of interest that should disqualify Warner Robins as a first article tester.

On August 17, 2010, the contracting officer issued a termination for default for "failure to comply with the essential requirements of the contract." *Id.* at 26. Notice of the termination was sent to PSI on September 3, 2010.

## Count 3

DLA awarded contract number SP0407-06-M-9684 for the manufacture of 10 structural aircraft panels to PSI on April 18, 2006. The contract required that PSI send its first article to Hill within 90 days (by July 17, 2006). The

parties disagree about when the first article was shipped to Hill–PSI claims May 2008, while the Agency claims June 2008. In any event, it was after the 90 day period required by the contract.

On October 7, 2008, Hill reported to the agency that the first article failed testing, identifying 9 discrepancies. PSI was informed by letter on October 21, 2008. DLA offered PSI the opportunity to resubmit a first article and requested that PSI submit a revised delivery schedule by November 4, 2008. PSI responded, contesting the rejection of the first article, requesting its return, and requesting conditional approval. The parties disagree as to whether the first article was returned to PSI. The parties executed a bilateral contract modification on March 31, 2010, setting the deadline for first article resubmission as May 7, 2010.

As of November 2010, PSI had not delivered a second first article. The contracting officer sent PSI a show cause notice requesting a response by November 18, 2010. PSI responded, through counsel, on November 26, 2010. In the response letter, PSI claimed that the Agency was precluded from terminating the contract for default because it had not returned the initial first article to PSI and because it never gave PSI a decision on its request for conditional approval. PSI indicated to the Agency that it believed DLA used the first article but refused to pay for it. PSI also made a claim for equitable adjustment for its rejected first article, consisting of $3,000 for the unreturned first article, $254.32 for time spend researching and analyzing the show cause notice, $806.89 in delay costs, and proposal preparation fees of $800. PSI informed DLA that it would work with the Government to establish a new discovery schedule after the Government returned the first article and ruled on the request for conditional approval.

In response to PSI's request for equitable adjustment, DLA issued a termination for default on December 6, 2010. DLA stated that it would pay $3,000 for the unreturned first article, but it denied the other components of PSI's request for equitable adjustment.

## Count 4

Contract number SPM4A7-08-M-5689 was awarded to PSI on March 31, 2008, for the production of 38 access covers for $44,800. It required a first article to be delivered at Hill within 180 days (by November 3, 2008). DLA inquired about the status of the first article on January 22, 2009. PSI responded

that the delinquency was due to DX-rated contracts.[3] PSI shipped the first article in May 2009.

On November 23, 2009, DLA sent a letter disapproving of the first article. Attached to the letter was a list of 14 discrepancies. The letter went on to state that a no-cost termination for convenience would be issued and that "[n]o further submission is requested or authorized." Def.'s App. 99. On December 2, 2009, DLA sent PSI a proposed bilateral modification to terminate the contract at no cost to either party. PSI refused to agree to the modification. DLA then informed PSI that the contract would be terminated for default.

PSI responded on November 19, 2010 with a claim for equitable adjustment in the amount of $16,144.62. Contracting Officer Sally Gorby sent DLA a response letter on December 14, 2010, stating that PSI's request for equitable adjustment was based on the mistaken belief that the contract had been terminated for convenience. It further asked PSI to show cause why the contract should not be terminated for default. In the alternative, the letter offered a no cost termination in lieu of termination for default. PSI responded through counsel on December 23, 2010, asserting that the government had constructively terminated the contract. PSI therefore purported to convert its request for equitable adjustment into a claim for equitable adjustment pursuant to the termination clause of the contract. PSI further requested a termination for convenience. DLA thereafter issued a termination for default.

## Count 5

Contract number SP0407-05-C-2028 was awarded on March 28, 2005. The first article was due by July 26, 2005. DLA received the first article on June 22, 2006. It was rejected on February 27, 2007. PSI subsequently submitted a second first article on July 20, 2007, and DLA conditionally approved it on December 18, 2007. PSI was notified of the conditional approval on January 10, 2008. Thus, pursuant to the contract, the parts were

---

[3] Under the Defense Priorities and Allocations Systems ("DPAS"), which is used to prioritize performance, defense contracts are identified by rating the symbols "DO" and "DX." Contractors are required to prioritize DX-rated orders over DO-rated orders and unrated orders.

due 293 days later, by October 30, 2008. PSI did not deliver any parts by this date.

By email dated November 25, 2008, Milan Reeder, Vice President of PSI, advised DLA that PSI would be shipping a minimum of five or more units the following week. He also indicated that PSI "ha[d] DX rated contracts which took priority." Def.'s App. 162. A modification was then issued by DLA to ship the first five parts by December 5, 2008 and the remaining 50 by the end of December in exchange for $350 consideration. PSI objected to this modification by letter on December 6, 2008, asserting that delivery of 50 panels by the end of December was "arbitrary, unrealistic, and nonfeasible." Pl.'s App. 493. The letter also accused DLA of causing delays of approximately 17 months, and requested modification to reflect the government delays. PSI shipped the first five panels that month, but did not submit the remainder.

On January 22, 2009, DLA sent PSI an email informing it that the contract had become delinquent and requesting a status update. DLA again contacted PSI on March 23, 2010m offering a no-cost termination for convenience. PSI responded, refusing the termination for convenience, stating that it had to interrupt production due to DX-rated contracts and that it expected to resume production within six weeks. DLA wrote back, stating that it would issue a modification changing the delivery date to May 14, 2010. PSI responded by email on April 2, 2010, advising that it expected to complete delivery of the remaining parts by July 30, 2010.

DLA sent a show cause notice on November 14, 2010. PSI responded by requesting equitable adjustment in the amount of $6,252.64 for the government's delay of its testing decision for both first articles and delay in returning the first article to PSI upon PSI's request.

On December 2, 2010, DLA issued a contract modification requiring the remaining units to be delivered by January 31, 2011. It subsequently denied PSI's request for equitable adjustment on December 8, 2010. PSI responded with a letter expressing concern over DLA's and the contracting officer's course of conduct. It subsequently shipped the remaining parts between December 2010 and March 2011.

**Count 6**

DLA awarded contract number SPM4A7-09-D-5547 to PSI in July 2009 for an indefinite quantity purchase order for bundle covers. On July 24, 2009, DLA issued Delivery Order 0001 for 24 covers to be delivered by November 30, 2009. On October 3, 2009, DLA issued Delivery Order 0002 for 29 covers for delivery by February 5, 2010. On January 29, 2010, DLA issued Delivery Order 0003 for 48 covers to be delivered by June 30, 2010. PSI delivered a portion of the covers for Delivery Order 0001 on June 12, 2010, and the remainder on July 11, 2010. On July 14, 2010, PSI delivered the covers for Delivery Order 0002.

DLA issued a show cause notice on January 25, 2011, regarding PSI's failure to deliver under Delivery Order 0003. PSI responded that it had never received Delivery Order 0003, but that it was prepared to complete all orders under the contract, including Delivery Order 0003, within the five year period of the contract with the date of Delivery Order 0003 running from the date of the letter announcing its existence. On February 10, 2011, the contracting officer issued a termination for default as to Delivery Order 0003.

**Count 7**

Count 7 concerns contract number SPM4A7-08-D-0316. This indefinite delivery, indefinite quantity contract for coupling adapter sleeves was awarded to PSI on July 30, 2008. It provided that delivery of orders was due 111 days after receipt of each order. DLA issued the following delivery orders:

1.  Delivery Order 0001: 111 units due November 18, 2008
2.  Delivery Order 0002: 74 units due February 22, 2010
3.  Delivery Order 0003: 81 units due April 27, 2010
4.  Delivery Order 0004: 80 units due June 28, 2010
5.  Delivery Order 0005: 79 units due July 28, 2010
6.  Delivery Order 0006: 283 units due January 5, 2011

On February 12, 2010, PSI delivered two of the units owed under Delivery Order 0002. Between June 2010 and August 2010, it delivered all but 14 of the units owed under Delivery Order 0001.

On November 16, 2010, DLA sent PSI a letter notifying PSI that all of the orders except Delivery Order 006 were delinquent and informing PSI that

9

it was considering terminating for default. The letter also provided that PSI would need to provide monetary consideration before the agency would accept any more shipments. It requested a response by November 19, 2010. PSI responded, claiming that the agency had overwhelmed it with orders. It also stated that it had 97 parts ready to ship but would stop delivery because it viewed DLA's demand for consideration as a stop work order.

PSI subsequently shipped the 97 parts. It then submitted a claim for equitable adjustment on November 26, 2010, demanding $23,012. PSI also objected to DLA's assertion that PSI had repudiated the contract, and countered that there was no longer a delivery schedule in place. On December 8, 2010, DLA sent a letter denying PSI's request for equitable adjustment. In this letter, DLA also stated that it had not waived delivery or the delivery schedule and that it expected PSI to deliver Delivery Order 0006 by the January 5, 2011 due date.  The letter further invited PSI to provide reasonable revised delivery dates for Delivery Orders 0003, 0004 and 0005. Otherwise, the letter provided, the agency would terminate for default. PSI did not respond. The agency thereafter terminated the contract for default on February 4, 2011.

## Count 8

Count 8 pertains to eight contracts which are further divided into Counts 8(A) through 8(H). The specific facts of each contract are detailed below. As of February 22, 2011, PSI had not shipped the required parts for any of the eight contracts. DLA therefore wrote PSI offering a no cost, no liability termination for all of the contracts and providing that it would terminate them for default if PSI did not respond by March 15, 2011. PSI sent a letter to DLA on February 28, 2011, challenging the authority of the contracting officer to "continually issue demands and threats with arbitrarily and capriciously set response-date demands." Def.'s App. 357.

PSI responded to DLA's letter again, through counsel, on April 7, 2011. It contended that the government had waived its right to terminate for default, and that the only action that DLA could take was to issue formal terminations for convenience. The letter also noted that the government had, in the past, typically allowed PSI to prioritize its DX-rated contracts over DLA's DO-rated contracts and that the government never set new dates for these contracts because it no longer had a need for the products. Thereafter, DLA terminated the contracts for default.

Count 8(A)

Count 8(A) pertains to contract number SPM4A7-07-D-3180. This indefinite delivery, indefinite quantity contract for lower left panel aircraft assemblies was awarded to PSI on March 6, 2007. The first article was due at Warner Robins 250 days after award on November 5, 2007. On March 20, 2007, DLA issued Delivery Order 001 for six panels. On March 21, 2007, DLA issued Delivery Order 0002 for another six panels. Both orders were placed before DLA received the first article for testing.

On February 5, 2008, in response to a request for clarification, DLA's contract administrator sent an email to PSI, informing it that the first article should be shipped against Delivery Order 0001. If approved, the first article requirement for Delivery Order 0002 would be deemed satisfied. The email also provided that delivery would be due 242 days after first article approval.

PSI responded, informing DLA that it would have the first article complete by March 7, 2008. It followed up via email on March 6, 2008, informing PSI that the first article would be ready by March 21, 2008 or earlier. On March 14, 2008, DLA issued modifications to Delivery Orders 0001 and 0002 to revise first article shipment to March 31, 2008. However, PSI did not ship the first article by March 31, 2008.  DLA inquired into the status of the first article on February 26, 2009. PSI did not respond.

On June 1, 2009, DLA issued Delivery Order 0003 for another six panels. It again inquired into the status of the first article on November 30, 2009. PSI advised the agency that it was planning on submitting its first article by December 18, 2009. As of March 29, 2010, PSI still had not delivered the first article. In communications with DLA through the Defense Contract Management Agency ("DCMA"), PSI indicated that it would ship the first article by the middle of April 2010. Nevertheless, the first article was never shipped, and on April 27, 2011, DLA terminated the contract for default.

Count 8(B)

Contract number SPM4A5-08-M-2072 for 162 aircraft access covers was awarded on February 22, 2008. The first article was due at Hill 240 days after award. On May 15, 2008, PSI shipped the first article, and on September 26, 2008, the agency informed PSI that the first article had failed testing. The

rejection letter invited PSI to submit another first article, submit a rebuttal letter, or request cancellation of the contract. The letter requested a response within 15 days, and warned that the contracts might be cancelled or terminated if PSI did not respond.

PSI did not respond. On May 4, 2009, DLA again contacted PSI requesting a status update within 15 days. DLA contacted PSI again on May 21, 2009, informing PSI that the contracts might be cancelled if a response was not received by May 22, 2009.

As of February 22, 2011, PSI still had not submitted another first article, and DLA issued a show cause notice. The only response was the April 7, 2011 letter, mentioned above, which expressed discontentment with DLA's course of action regarding the contracts in general but did not provide responses as to each specific contract. DLA terminated the contract for default on April 29, 2011.

Count 8(C)

Contract number SPM4A7-07-M-6269 for 34 fairing assemblies was awarded on April 12, 2007. The contract required the first article in 90 days, but it also provided that a first article which PSI had previously submitted for a contract not at issue in this case would suffice if it was approved. On February 14, 2008, and again on October 10, 2009, however, PSI's first article submissions were rejected.

On March 30, 2010, DLA sent PSI an email offering a no cost termination and requesting a response by April 1, 2010. On May 5, 2010, DLA sent an email attaching a proposed modification to the contract to terminate it at no cost. PSI refused to agree to the no-cost termination.

As of February 22, 2011, PSI still had not submitted another first article, and a show cause notice was issued. PSI responded only via the April 7, 2011 letter. DLA terminated the contract for default on April 29, 2011.

Count 8(D)

Contract number SPM4A7-08-C-0387 for 30 aircraft fairings was awarded on June 6, 2008. The first article was due on December 13, 2008. On April 21, 2010, a representative of DCMA sent a message to DLA, indicating

that PSI had made no progress toward the completion of the order. On June 8, 2010, DLA contacted PSI warning that no progress was being made and therefore the contract would be cancelled at no cost to the government.

PSI responded on June 10, 2010, stating that progress had been made and that it did not assent to a termination for convenience. DLA emailed back that day, asking "where do we stand on this contract?" Def.'s App. 434. PSI did not respond.

As of February 22, 2011, PSI still had not submitted a first article, and DLA issued a show cause notice. PSI only responded via the April 7, 2011 letter. DLA terminated the contract for default on May 6, 2011.

Count 8(E)

On June 23, 2008, DLA awarded PSI contract number SPM4A7-08-D-0274, an indefinite delivery, indefinite quantity contract  for wing to fuselage fairing panels. The first article was due by November 5, 2008. DLA issued the following delivery orders: Delivery Order 0001 on September 19, 2008 for 15 panels, and Delivery Order 0002 on  December 5, 2008 for 17 panels.

On March 13, 2009, PSI told the agency that it had not yet shipped a first article or begun production. DLA then issued a modification to Delivery Order 0001, adding a requirement of a first article to be delivered by July 6, 2009. As of February 3, 2010, PSI still had not delivered the first article. DLA informed PSI that the item was over-procured and offered a partial cancellation, to which PSI agreed. Thus, DLA issued a modification to Delivery Order 0002 decreasing it to 6 panels.

As of February 22, 2011, PSI still had not submitted a first article, and DLA issued a show cause notice. PSI responded only via the April 7, 2011 letter. DLA terminated the contract for default on May 10, 2011.

Count 8(F)

DLA awarded contract number SPM4A7-07-M-A678 for 19 aircraft fairings to PSI on August 6, 2007. The first article was due February 2, 2008. On March 3, 2008, PSI requested a mylar that it needed for the part from DLA. It requested the mylar again on June 17, 2009. A 2010 letter from PSI to DLA indicated that the mylar was provided to PSI on July 2, 2010.

13

On August 8, 2010, DLA issued a modification revising the delivery date to January 30, 2011.  As of February 22, 2011, PSI still had not submitted a first article, and thus a show cause notice was issued. PSI responded only via the April 7, 2011 letter. DLA terminated the contract for default on April 29, 2011.

Count 8(G)

This contract, number SPM4A7-07-M-C357, for 50 aileron trailing edge assemblies was awarded to PSI on September 14, 2007. The first article was due in 180 days, by March 12, 2008.  DLA contacted PSI on June 11, 2009, to report that the government had a critical need for the parts and to ask if the first article had shipped. PSI responded on June 16, 2009, advising that the first article was complete and ready for spot welding, and would ship by August 19, 2009.

The first article did not ship by August 19, 2009. On July 12, 2010, PSI informed DLA that the reason for the delay was spot welding issues and that the first article was expected to ship by July 31, 2010. The first article was not shipped by this date. In February 2011, PSI indicated that it would ship the first article by the end of March 2011.

As of February 22, 2011, PSI still had not submitted a first article, and a show cause notice was issued. PSI responded only via the April 7, 2011 letter. DLA terminated the contract for default on April 29, 2011.

Count 8(H)

On August 16, 2008, this contract, number SPM4A7-08-C-048, for 38 aircraft access doors was awarded to PSI. The first article was due by February 12, 2009. As of July 1, 2009, PSI had not shipped the first article, and DLA requested a status update.  In response, PSI indicated that it expected to ship the first article by September  15, 2009.

As of June 3, 2010, PSI had still not shipped the part, and DLA requested a status update. PSI responded that it intended to ship the part. On October 7, 2010, DLA contacted PSI to request a reduction of the quantity by four. PSI did not respond, and DLA contacted PSI again on November 8, 2010 to request a response.

On December 15, 2010, DLA was notified by DCMA that PSI had not yet begun production because it was awaiting approval from DLA on a similar part. On January 21, 2011, DLA contacted PSI again asking for the status of the part.  On January 31, 2011, DLA repeated its request for a status update and its request to reduce the total contract amount by four parts. DLA renewed this request for the last time on February 7, 2011.

As of February 22, 2011, PSI still had not submitted a first article, and DLA issued a show cause notice. PSI responded via the April 7, 2011 letter. DLA terminated the contract for default on May 6, 2011.

## Count 9

Count 9 pertains to 14 additional contracts, which are divided into Count 9(A) through 9(N).  Defendant has made a prima facie case that it is entitled to summary judgment as to Counts 9(A) through 9(N) because PSI either failed to deliver the products or failed to submit second first articles after its initial submissions were rejected. As discussed more fully below, plaintiff has failed to set forth any meaningful response to defendant's motion as to Counts 9(A) through 9(K). Therefore, for the purpose of brevity, we will only provide the facts for Counts 9(L) through 9(M).

Count 9(L)

Contract number SPM4A7-07-M-0637 for 12 cowlings was awarded on October 25, 2006. The first article was due in 120 days, by February 22, 2007. On February 9, 2007, PSI submitted a request for copies of three drawings that it needed to complete the part. DLA responded, recommending that PSI contact Lockheed Martin for the drawings. PSI again requested the drawings on April 25, 2007, and they were provided to PSI by DLA on May 30, 2007.

On July 26, 2007, the contracting officer issued a modification, changing the deadline for first article submission to September 15, 2007. This modification also changed the product delivery date to May 13, 2008. On October 22, 2007, PSI shipped the first article.

The first article was rejected on May 20, 2008 because it failed a form, fit, and function test and because the spot welds did not conform to the drawings. PSI was given the opportunity to submit another first article, with

PSI to bear the costs. PSI subsequently requested that DLA return the rejected first article and asked that DLA send a full copy of the test report. In November 2008, PSI submitted five samples to an independent company to test the spot welds. The testing company determined that all five samples had spot weld failures.

On January 6, 2009, PSI reported to DLA that it would ship a new first article by the end of the month. On January 30, 2009, DLA contacted PSI to inform it that the contract was delinquent and demanded monetary consideration and an explanation for the delay. PSI responded that the first article had not shipped because it was still waiting for the rejected first article to be returned.

On February 11, 2009, PSI received the initial first article back from DLA. On March 16, 2009, PSI stated that it would submit a new first article by April 15, 2009. As of May 29, 2009, PSI had yet to ship the second first article, and DLA contacted PSI to request an updated delivery date.

On June 10, 2009, PSI shipped the second first article. On December 17, 2009, PSI was notified that its second first article was rejected, again due to spot weld failures and improper fit.

DLA issued a show cause notice for this contract and two others on July 8, 2011, offering PSI a no-cost termination or the opportunity to provide another first article for testing. PSI responded that the government's charges of delinquency were themselves untimely and argued that there was no effective schedule in place.

DLA terminated the contract for default on September 1, 2011. Four months later, PSI submitted a claim for equitable adjustment seeking $84,421.55 attributable to government-caused delay. This claim was rejected on February 13, 2012.

Counts 9(M) and 9(N)

Count 9(M) pertains to contract number SPM4A7-08-M-7193 for 20 panel assemblies awarded to PSI on March 5, 2008. The first article was due by August 22, 2008. PSI submitted a first article, which was rejected by Warner Robins on April 30, 2010. The memorandum explaining the rejection provided that the panel had the wrong contour and several disbonds were

found along the edge of the panel. On May 24, 2010, DLA informed PSI of the rejection, and invited PSI to submit a new first article. PSI did not respond to this letter and did not submit a new first article.

Count 9(N) pertains to contract number SPM4A7-08-M-7646 for 300 bulkhead clips which was awarded to PSI on March 21, 2008. The first article was due on October 22, 2008. PSI submitted a first article, which was rejected by Hill on January 20, 2009 due to dimensional discrepancies and an improper bend. On February 4, 2009, DLA informed PSI that it could submit a new first article or request a no-cost cancellation. PSI did not respond. DLA contacted PSI two more times requesting a response. On April 2, 2010, PSI responded, providing that it would submit its first article within 30 days. However, PSI never submitted a new first article.

Both contracts were included in the July 8, 2011 show cause notice mentioned above, to which PSI responded by claiming that the government's charges of delinquency were themselves untimely, and that there was no effective schedule in place. The contracts were terminated for default on September 1, 2011.

## DISCUSSION

The government argues that it is entitled to summary judgment with respect to Counts 6, 7, 8(A), 8(C) through 8(H), and 9(A) through 9(K) because PSI failed to deliver the required products. Each of the 19 contracts associated with Counts 8 and 9 incorporates either FAR 52.209-3(d) or FAR 52.209-4(d), which both state that if "the Contractor fails to deliver any first article on time, or the Contracting Officer disapproves of any first article, the Contractor shall be deemed to have failed to make delivery within the meaning of the Default clause of this contract." 48 C.F.R. §§ 52.209-3(d), 52.209-4(d) (2015). Although the contracts underlying Counts 6 and 7 did not have first article requirements, PSI failed to deliver all of the parts ordered. The default clause in these contracts states that the government may terminate a contract for default "if the Contractor fails to - (i) Deliver the supplies or to perform the services within the time specified in this contract or any extension." *Id.* § 52.249-8(a)(1). Defendant therefore argues that the agency was entitled to terminate these contracts for default pursuant to their respective default clauses.

For Counts 2-4, 8(B), and 9(L) through 9(N), the government contends that it is entitled to summary judgment because PSI's first articles failed inspection and PSI never submitted second first articles. Defendant claims that, because successful first article submissions were required under these contracts, DLA was entitled to terminate for default upon PSI's failure to submit acceptable first articles. In response to PSI's allegation that Warner Robins improperly rejected PSI's first articles in order to purchase the same parts from its own internal manufacturing facility, defendant points out that this argument fails because the first articles for Counts 3, 4, 8(B) and 9(N) were submitted to Hill, not Warner Robins, and PSI has offered no evidence that Warner Robins even manufactured the same parts required by the contracts in Counts 2, 9(L), and 9(M). Rather, defendant argues, PSI is engaging in mere speculation.

For Count 5, PSI's appeal of the denial of its request for equitable adjustment, defendant argues that it is entitled to summary judgment because PSI did not make a timely request for equitable adjustment. Rather, it raised the issue nearly four years after receiving notice that its first article was rejected and nearly three years after receiving notice that its second first article was conditionally approved. In addition, PSI was provided additional time within which to deliver the remaining parts, but PSI failed to meet those deadlines and therefore is entitled to no more from the government.

In response, plaintiff argues that, for all of the contracts, DLA waived delivery dates through its course of dealing with PSI over the years. According to plaintiff, PSI and DLA had an informal working relationship whereby delivery schedules were not strictly enforced and DLA regularly allowed deadlines to pass. Plaintiff contends that it relied on this waiver by accepting contracts based on the understanding that DLA would continue to be flexible with delivery schedules.

Plaintiff also argues that for all of the contracts at issue in this motion, DLA abused its discretion by failing to consider the impact of DX-rated orders when terminating PSI's contracts for default. Plaintiff contends that under the Defense Priorities and Allocations Systems ("DPAS"), which is used to prioritize the performance of defense contracts, contractors are required to prioritize DX-rated orders over DO-rated orders and unrated orders. All of the contracts listed in the complaint were DO-rated or unrated. However, during the relevant time period, PSI had a number of DX-rated orders with Sikorsky Aircraft Corporation. Plaintiff argues that the law required it to reschedule and

delay its lower-rated orders with DLA in order to accomodate the DX-rated orders. Further, plaintiff contends that the government was aware of PSI's DX-rated contracts and therefore should have considered them when determining whether to terminate for default.

Regarding Counts 2, 3, 4, 8(B), 9(L), 9(M), and 9(M), the contracts for which PSI's initial first article was rejected and it did not submit second first articles, PSI argues that DLA abused its discretion because it failed to grant conditional approval for first articles with easily correctable defects. Plaintiff provides the affidavit of Jeremy Wilczewski, the Chief Operating Officer of PSI, explaining how PSI could have easily corrected the defects that DLA identified in its first article rejections.

PSI concludes by arguing that DLA was obligated by law to equitably adjust the contract associated with Count 5. PSI contends that FAR 52.209-4(f) requires the government to pay the contractor for delays in first article approval if timely written request is made and that, here, a timely request was made–four days after the agency issued a modification extending the delivery date.

Defendant replies that, having met its burden of establishing that PSI did not meet the performance deadlines, the burden shifts to PSI to excuse the failure to deliver. Defendant claims that plaintiff's argument that the government waived delivery deadlines is without support because it fails to establish the elements necessary to prove a waiver: (1) failure to terminate within a reasonable time after default under circumstances indicating forbearance and (2) reliance by the contractor on the failure to terminate. *DeVito v. United States*, 413 F.2d 1147, 1154 (Ct. Cl. 1969). According to defendant, PSI offers no evidence that it performed on the contracts, or that it continued to perform after the expiration of the delivery dates. Defendant also contends that plaintiff has failed to sufficiently explain why its obligations to complete DX-rated contracts precluded it from fulfilling its obligations under the contracts with DLA and argues that plaintiff's conditional approval argument is unsupported by the evidence.

We begin by addressing plaintiff's general arguments that DLA waived the delivery deadlines through its course of dealing and that DLA abused its discretion in failing to consider the impact of PSI's DX-rated contracts when it terminated several of the contracts for default. As we discuss in detail below, we agree with defendant. Plaintiff has failed to establish waiver as to any of

the contracts or that DLA was required to consider PSI's DX-rated contracts when terminating for default.[4]

Plaintiff argues that, for all of the contracts at issue and for past contracts, DLA routinely allowed delivery dates to pass and generally made it clear to PSI that time was not of the essence. Thus, according to plaintiff, it accepted the contracts with the expectation that DLA would continue not to strictly enforce delivery dates. Plaintiff points out that, in 2009, DLA went through a reorganization that involved a restructuring of its post-award branch. According to plaintiff, the agency thereafter abruptly changed its course of dealing, resulting in DLA suddenly demanding performance for all contracts at once. This argument, however, does not explain why DLA's decision to terminate any specific contract was unreasonable. What we would need from plaintiff to accept its waiver argument are contract-specific facts showing "failure to terminate within a reasonable time after default under circumstances indicating forbearance." *DeVito*, 413 F.2d at 1154. The broad approach which plaintiff takes in arguing waiver by DLA is not sufficient. Only the circumstances surrounding each individual contract determine whether the agency was within its rights in terminating that contract for default.

Counts 2, 3, and 4 all had first article submissions which were rejected. In Count 2, a second first article was submitted and also rejected. The agency therefore informed PSI that it could either submit another first article or cancel the contract. PSI, however, failed to inform the agency whether it would submit a new first article or agree to a cancellation. As to Count 3, after the first article was rejected, the parties bilaterally set a new date for first article resubmission. However, that date passed without PSI submitting a new first article. In Count 4, after the first article was rejected, the agency sent a proposed bilateral termination for convenience. PSI refused to sign it, but did not indicate that it planned to submit another first article. The agency ultimately issued show cause notices for each of these contracts. These facts cannot be construed as showing waiver by DLA. PSI was given the option to either resubmit a first article or cancel the contract–neither option is indicative of forbearance by DLA.

---

[4] Plaintiff makes these arguments as to all of the contracts, but Counts 7, 8(A), 8(C) through 8(H), and 9(A) through 9(K) rest entirely on these arguments.

Count 7 pertains to an indefinite delivery, indefinite quantity contract consisting of six separate orders. The first five had delivery dates spanning from November 2008 through July 2010. Nevertheless, as of November 2010, PSI had only shipped a portion of the first two orders. DLA thus notified PSI that the contract was delinquent and that consideration was required before it would accept any more shipments. PSI, however, did not take any steps towards providing consideration and establishing new delivery dates. Instead, it submitted a claim for equitable adjustment, which DLA subsequently denied. In its denial letter, DLA reiterated that it expected delivery for the final order and that if PSI did not provide revised delivery dates for the earlier orders, DLA would terminate for default. These facts do not indicate forbearance by DLA. Moreover, PSI has not shown "reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied or express consent." *DeVito*, 188 Ct. Cl. at 1154. While PSI shipped some parts after it was notified of its delinquencies, this was not done with the government's consent, as DLA had informed PSI that it would require consideration before accepting late shipments. Def.'s App. 248-49. Thereafter, PSI never informed the agency whether it was working on the remaining parts. Nor did it ship them.

The contracts in Counts 8(A), 8(C) through 8(H), and 9(A) through 9(K) had first article requirements, but PSI failed to provide a first article. Count 8(C)'s first article requirement was tied to another contract. If the other first article was accepted, PSI would receive a first article waiver for this contract. However, the first article submission for the other contract was rejected twice, and PSI did not indicate whether it would submit another first article. DLA therefore offered PSI a no-cost termination, which PSI refused to sign. PSI did not, however, indicate that it would submit another first article and never delivered one. This course of conduct again fails to show reliance by PSI on the failure to terminate or continued performance under the contract and thus fails to meet the requirements for waiver.

Counts 8(D), 8(F), and 9(A) through 9(K) transpired similarly–PSI failed to deliver the first article on time and, for several of the counts, declined to agree to the government's proposed no-cost cancellation. However, PSI never indicated to DLA that it was working on a first article and planned to

21

complete performance.[5] Thus, DLA terminated the contracts for default. As stated above, this course of conduct does not establish reliance by PSI on the failure to terminate or continued performance under the contract, and therefore it fails to meet the requirements for waiver.

For Counts 8(A), 8(E), 8(G), and 8(H), the agency requested several status updates after the first article deadlines passed. Each time, PSI advised that it was working on the first article or otherwise gave a new shipment date. However, PSI never delivered the first articles and therefore DLA issued show cause notices. These contracts can be differentiated from those discussed above, however, because there is evidence that PSI told the agency that it was working on the first articles and would ship them soon, which is indicative of reliance. DLA's failure to terminate when PSI indicated that it would ship the first article late therefore could be construed as a waiver of the delivery date. Thus, we are unable to grant summary judgment as to these contracts.

Next, we find no abuse of discretion in DLA's failure to consider the impact of PSI's DX-rated contracts when it terminated several of PSI's contracts for default. Plaintiff is correct that it was required to give DX-rated orders preference over DO-rated and unrated orders. 15 C.F.R. § 700.14(b) (2015). However, PSI has not alleged that it was forced into accepting DO-rated and unrated orders from DLA. In fact, the regulations provide that a contractor shall *not* accept a rated order for delivery if it cannot fill the order by the required date, or if it will interfere with previously accepted DO or DX-rated orders. *Id.* § 700.13(b). PSI, however, never declined any contracts because of performance issues stemming from other rated contracts. *See* Def.'s App. 1065 (deposition of Jeremy Wilczewski). Thus, PSI was not acting under duress and the blame cannot be shifted to the agency for failing to consider

---

[5] For Counts 8(D) and 9(K), PSI was asked where it stood on the contract but did not respond. Plaintiff contends that it was customary for PSI to communicate with DLA through DCMA and thus DLA was given status updates through DCMA, but does not provide any evidence that PSI gave DLA specific updates as to the progress of these contracts. For Count 9(A), the government warned PSI that, if it did not propose a new delivery date, the contract would be terminated for default. PSI responded, but did not propose a new delivery date. For Counts 9(D), 9(G), and 9(J), PSI provided a new ship date but did not ship by this date and did not otherwise indicate that it was working on the first article.

PSI's higher-rated orders. PSI simply should not have accepted orders which it was unable to fill or which interfered with earlier higher-rated orders.

PSI attempts to argue that the burden to rearrange the delivery schedule can be shifted to the agency because it was on notice of PSI's DX-rated contracts. There is no merit to this argument, however, because the agency was not given proper notice. The regulation dealing with the notice requirement provides that

> [i]f a person has accepted a rated order and subsequently finds that shipment or performance will be delayed, the person must notify the customer immediately, give the reasons for the delay, and advise of a new shipment or performance date. If notification is given verbally, written (hard copy) or electronic confirmation must be provided within one working day of the verbal notice.

*Id.* § 700.13(d)(3). There is no indication in the record that PSI provided notice to the agency. As to all of the contracts pertaining to Count 8, PSI first mentioned its DX-rated contracts in its response to DLA's show cause notice, well after it had failed to meet delivery deadlines. This reference by PSI to its DX-rated contracts simply refers to an "understanding" that PSI would prioritize DX-rated contracts. Def.'s App. 297, 316. This is unspecific and does not suffice to provide the notice required by the regulations. In fact, the only contracts for which PSI explicitly informed the agency that delivery would be delayed due to DX-rated contracts were those underlying Counts 4 and 5. However, rather than notifying the agency immediately and providing reasons for the delay, as required by the regulations, PSI waited until the agency inquired about the late shipment before it mentioned that it had interrupted production due to DX-rated contracts. *See* Pl.'s App. 398; Def.'s App 162-64. DLA therefore had no obligation to allow PSI to extend delivery dates due to conflicts with higher-rated contracts. Accordingly, we reject the argument, as to all contracts, that DLA abused its discretion in failing to consider the impact of PSI's DX-rated contracts when it terminated several of PSI's contracts for default.

Thus, we are left with plaintiff's remaining arguments as to Counts 2, 3, 4, 5, 6, 8(B), 9(L), 9(N), and 9(M). Regarding Count 5, plaintiff's remaining argument is that it was entitled to equitable adjustment because the government delayed first article approval. We reject this argument because the

government did equitably adjust the contract. The relevant FAR provision provides that if the government delays completion of first article disapproval or conditional approval, it "shall, upon timely written request from the Contractor, equitably adjust under the Changes clause of this contract the delivery or performance dates and/or the contract price, and any other contractual term affected by the delay." 48 C.F.R. § 52.209–4(f) (2015). The parts were originally due in October 2008. DLA issued several modifications extending the due date, which ultimately resulted in a January 2011 due date. Thus, if DLA delayed performance, it remedied its delay by equitably adjusting the performance dates of the contract. We therefore grant summary judgment as to Count 5.

As to Count 6, plaintiff argues that DLA's decision to terminate the contract for default based on PSI's failure to deliver Delivery Order 0003 was arbitrary and capricious because PSI never received the third order. Defendant contends that the order was sent to the email address provided by PSI. Plaintiff responds that DLA has not verified whether the order actually went through. The contracting officer stated in her deposition that Delivery Order 0003 was sent by the same means as Delivery Orders 0001 and 0002, and that it was posted to DLA's computerized ordering system. However, she could not recall if she checked her electronic contract file to see if the notice had actually been sent to PSI. We find that this information presents fact issues which we cannot resolve on summary judgment, and therefore deny summary judgment as to Count 6.

The remaining issue is whether the first articles for the contracts associated with Counts 2, 3, 4, 8(B), 9(L), 9(N), and 9(M) should have been granted conditional approval because their defects were easily correctable. Plaintiff points to a number of Armed Services Board of Contract Appeals ("ASBCA") decisions in which termination for default of a contract which provides for conditional approval was reversed where the first article with easily correctable defects was rejected. *See, e.g.*, Marvin Engineering Company, Inc., ASBCA No. 27016, 84-2 BCA ¶ 17,401; Harco Manufacturing Company, ASBCA No. 27567, 85-1 DCA ¶ 17,926. Forfeiture is inappropriate where the only basis for rejection of the first article is defects that could be easily corrected during production.

To support its argument that the defects were easily correctable, plaintiff provides the affidavit of its Chief Operating Officer. In this affidavit, Mr. Wilczewski notes the discrepancies identified in the notices of first article

rejections as to the relevant contracts and explains how each defect could have been corrected during production. The contract underlying Count 3, for example, was rejected due to dimensional discrepancies, because a strap was off-center, because the part was the wrong shade of gray, and because two certifications were missing. Wilczewski explains in his affidavit that the dimensional variations could have been easily corrected by adjusting the trim fixture, and the strap could have been easily corrected by adjusting its location. Wilczewski Affidavit ¶ 39. Moreover, he states that the color could have been easily changed, and the missing certifications could have been easily remedied by giving the government the correct paperwork. *Id.*

We find that the Wilczewski affidavit is sufficient to defeat the government's motion for summary judgment as to these counts. *See TechSearch, LLC v. Intel Corp.*, 286 F.3d 1360, 1372 (Fed. Cir. 2002) ("[T]the party opposing the motion for summary judgment . . . must point to an evidentiary conflict created on the record, at least by a counter-statement of a fact set forth in detail in an affidavit by a knowledgeable affiant."). The affidavit has set forth facts which create a genuine issue as to whether these defects were easily correctable and thus whether PSI was entitled to conditional approval of its initial first articles. Therefore, we deny summary judgment as to Counts 2, 3, 4, 8(B), 9(L), 9(N), and 9(M).[6]

CONCLUSION

For the reasons stated herein, we grant in part and deny in part defendant's motion for summary judgment. The clerk is directed to enter judgment for defendant as to Counts 5, 7, 8(C), 8(D), 8(F), and 9(A) through 9(K). The parties are directed to consult and jointly propose a trial schedule by June 30, 2016.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

---

[6] Plaintiff also makes additional count-specific arguments as to Count 2, 3, 4, and 9(L). However, because plaintiff has already defeated summary judgment as to these counts with its conditional approval argument, there is no need to address these arguments.

25